```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Daniel Thomas, et al.,        :

        Plaintiffs,            :   Case No. 2:14-cv-1236

   v.                          :
                                   CHIEF JUDGE EDMUND A. SARGUS, JR.
                                   Magistrate Judge Kemp
Nationwide Children's Hospital,
Inc., et al.,                  :

        Defendants.
```

OPINION AND ORDER

This case is before the Court to resolve Plaintiffs' motion to compel discovery as well as Defendants' motion to strike that motion.  Both motions are fully briefed.  For the following reasons, the Court will deny the motion to strike and grant the motion to compel.

## I. Introduction

Because, as this Opinion and Order will reveal, the precise nature of Plaintiffs' claims is something about which the briefing on the motion to compel disagrees, the Court will lay out those claims in some detail.  Some of this background can be found in prior orders in this case, such as <u>Thomas v. Nationwide Children's Hospital</u>, 2015 WL 7829139 (S.D. Ohio Dec. 4, 2015), but the Court will elaborate on that background as needed.

In that prior order, the Court explained that

> [i]n their second amended complaint, the three sets of Plaintiffs – Anna and Daniel Thomas, Chad and Lori Burley, and Jessica Rose and Russell Moore, together with their children - allege that the Defendants, including Nationwide Children's Hospital and its employees, conspired to violate the rights of parents and children who sought medical treatment at the hospital. More specifically, they claim that, in their respective cases, after they sought treatment for their

> children, hospital employees ordered additional medical tests not for the purpose of diagnosis and treatment, but in order to gather evidence for possible criminal prosecution for child abuse. In some instances, that involved bringing other children into the hospital for testing. All of the parents assert that they did not give informed consent to these procedures, and that medical information was provided to third parties, such as the Columbus Division of Police or Franklin County Children's Services, without their consent as well. The complaint includes claims sounding in assault, false imprisonment, violation of the physician-patient privilege, negligent or reckless infliction of emotional distress (asserted only by Anna Thomas), and violations of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Id. at *1.  More specifically, the Plaintiffs pleaded that the some of their children were "subjected to high doses of ionizing radiation and insertion of needles into their bodies," Doc. 17, ¶1-3, and that they were inordinately detained in the emergency room of the Hospital or as an inpatient.  All of this occurred, according to Plaintiffs, because the Hospital had decided to "engage in evidence collection directed to establishing child abuse for purposes of juvenile and criminal proceedings" even though it was "aware that parents and children seeking medical treatment ... enjoyed constitutional protections against unreasonable search and seizure, constitutional privileges of family association, and individual protections of confidential medical information."  Id., ¶12.  Plaintiffs assert that this was part of a concerted effort to "obtain and share confidential medical information without affording parents and children ... constitutional protections and without probable cause that any child abuse had occurred."  Id.  The other players in this scheme were, according to the complaint, the City of Columbus and Franklin County Children's Services.  Plaintiffs allege that in order to make all of this happen, the Hospital decided not to

-2-

inform the parents whose children would be subject to these procedures either of the reason for the examinations or the right to object or to refuse.

The nine claims in the complaint, which are summarized above, allege:

```
Count One - assault (Ohio law)
Count Two - false imprisonment (Ohio law)
Count Three - violation of the physician-patient privilege
(Ohio law)
Count Four - Infliction of emotional distress (Ohio law)
Count Five - Unlawful search and seizure (Federal law)
Count Six - Privacy violation (Federal law)
Count Seven - Privacy violation (Federal law)
Count Eight - Due process violation (Federal law)
Count Nine - Declaratory relief (Federal law)
```

None of the claims allege that any of the medical procedures which the children were forced to undergo were performed in a negligent or incompetent fashion, and there is no state law claim which specifically alleges medical malpractice.  The significance of the absence of such a claim is discussed below.

## II.  The Discovery Issue

The issue addressed by the motion to compel apparently arose for the first time in 2015 when the Hospital, in response to some written discovery requests, objected to providing information or documents on grounds of privilege.  Plaintiffs filed a motion to compel (Doc. 51) and in response, the Hospital suggested, among other things, that Plaintiffs had asked for "internal peer-review assessments of every patient complaint it has ever received about child abuse diagnosis" - something that the Hospital said had "nothing to do with this case."  Doc. 57, at 1.  However, the Hospital also argued that any internal assessments of medical care were protected by the peer-review and self-critical evaluation privileges.  Id. at 10.

The parties agreed, at a status conference, to forego a

ruling on that motion pending other discovery, and the Court terminated it in an internal docket notation dated February 29, 2016.  The peer review privilege issue did not resurface again until Plaintiffs took the deposition of hospital employee Cheryl Hiatt on November 16, 2016.

The transcript of that deposition has now been filed.  See Doc. 114.  The Court finds it helpful to provide a fairly complete summary of her testimony in order to give some context to the parties' dispute.

According to Ms. Hiatt's testimony, she is currently employed as a nurse at the Hospital.  At the time of the events described in the complaint, she was working in the Emergency Department as a Performance Improvement Coordinator.  Shawn Chambers, another employee, did the same job.  Ms. Hiatt reported to the Emergency Department manager, Randy Smith, and to the Emergency Services vice president, Duane Kusler.

Twice a month, the clinical leaders in the Emergency Department met to discuss events or developments in that department.  Ms. Hiatt routinely attended those meetings.  She did not actually perform nursing duties during those years, but dealt with customer satisfaction, reviewing written customer satisfaction surveys, taking phone calls or emails, and, at times, speaking directly to a customer.  With respect to some, but not all, of these encounters (especially if the resolution of the matter involved writing a letter), she made an entry into a database system called CS STARS.

Ms. Hiatt then began to testify about her interaction with the Thomas family.  After she explained what she recalled about that interaction, she was asked if the information she provided was included in the CS STARS summary.  At that point, Hospital counsel objected, noting that "the CS STARS database is a quality improvement program, peer review program database that is

-4-

maintained by the hospital as a part of its quality improvement and peer review process" and that "we're not going to let Cheryl talk about the contents of the CS STARS database."  (Tr. 22). Plaintiffs' counsel pointed out that he had never been made aware that there was information in this document that related to the Thomases, nor was it listed on a privilege log, an assertion which Hospital counsel disputed.  After some further dialogue among counsel, Ms. Hiatt was asked to confirm that she sent a letter to Anna Thomas on December 6, 2013, which addressed Ms. Thomas's concerns about what had happened to her children in the Emergency Department.  Those concerns were contained in a letter Ms. Thomas had written and which Ms. Hiatt saw in the CS STARS database.  Both letters are exhibits to the deposition.  Ms. Hiatt's letter said that the Emergency Department Leadership Team and the Director Physician for the Child Abuse team had thoroughly reviewed the situation and had concluded that the tests or procedures performed on one of the children were appropriate and followed both hospital procedures and procedures which were State-mandated.

    Ms. Hiatt was then questioned about how she came to the conclusions stated in her letter.  She said that after seeing Ms. Thomas's letter, Ms. Hiatt called and spoke to Ms. Thomas on a few occasions.  She was then asked what else she did in response to the letter, focusing particularly on how she investigated Ms. Thomas's concerns before responding in writing.  Again, Hospital counsel objected, saying "She may testify to those discussions she had with Mrs. Thomas .... Otherwise, we are going to instruct her not to answer in accordance with the peer review statute." (Tr. 47).  He then specifically instructed Ms. Hiatt not to answer this question: "Tell me what process this investigation was," (Tr. 48), stating that he would not permit her to testify about "even the fact of the steps that she would have taken."

<u>Id</u>. Ms. Hiatt was again instructed by counsel not to discuss any aspect of the review process that was referred to in her letter other than what she may have told Ms. Thomas at the time. Additionally, she was not permitted to answer questions about who else may have had input into the content of the letter she wrote. (Tr. 52). It appears that the same instructions would have been given at the deposition of Shawn Chambers, but Plaintiffs - ostensibly for that reason - chose to cancel his deposition, which had been noticed for the following day. It should be obvious from this recital of the dispute that the parties do not agree about whether the peer review privilege was properly invoked at Ms. Hiatt's deposition and whether it supported each instruction not to answer.

### III. <u>The Procedural History</u>

Because the Hospital has raised, both in its motion to strike and in its response to the motion to compel, an issue about the timeliness of the latter motion, it is also necessary to go into some detail about the procedural history of the dispute. The Court will start with the Hospital's version of the relevant procedural facts, and will then set out Plaintiff's competing version.

As mentioned briefly above, the Hospital first identified the peer review privilege issue in May, 2015, in response to written discovery requests. In July of that year, it served on Plaintiffs a privilege log which described some emails between Shawn Chambers and Dr. Thackeray (which the Hospital declined to produce) as "regarding peer review investigation of complaint." <u>See</u> Doc. 117. Other documents which were withheld from production also were labeled as relating in some way to peer review or quality assurance. Ms. Hiatt's name did not appear on the privilege log. Although the motion to compel which was filed on July 7, 2015 did not directly address the peer review

privilege (the log post-dated that motion by three days), the Hospital's response did, as did the reply (Doc. 59). And, as noted above, that motion (which dealt primarily, but not exclusively, with requests for information about child abuse complaints and investigations involving persons other than the Plaintiffs) was withdrawn pending the outcome of other discovery.

Ms. Hiatt was deposed on November 16, 2016, only a few weeks before the discovery cutoff date of December 2, 2016. The current motion to compel was filed on December 9, 2016. Under the Court's initial pretrial order (Doc. 33), discovery was to have been completed by April 1, 2016. That order said nothing about when discovery motions had to be filed. Neither did the two subsequent orders extending the discovery cutoff date (Docs. 83 and 100). The Hospital, however, argues that the motion was untimely because it could have been, but was not, filed during the discovery period.

Plaintiffs point out the following additional facts. First, they say that peer review privilege had not been asserted as a bar to discovery at other depositions, and they had no reason to believe it would become an issue at Ms. Hiatt's. Second, they point out that they did move during the discovery period for an extension of the cutoff date specifically in order to permit the peer review issue to be decided and, if necessary, to complete Ms. Hiatt's deposition and to depose Mr. Chambers. See Doc. 111. Counsel also attempted to reach agreement on that extension and the parties discussed a possible resolution as late as November 30, 2016. Lastly, they note that the motion was filed only a week after the existing discovery cutoff date. The Court will discuss the significance of all of these facts when it rules on the motion to strike, which it will do so immediately below.

### IV. The Motion to Strike

The Hospital makes a lengthy argument that the motion to

-7-

compel is untimely, based on cases like <u>FedEx Corp. v. United States</u>, 2011 WL 2023297 (W.D. Tenn. March 28, 2011), and cases cited therein, which have denied motions to compel discovery filed after the discovery cutoff date. It contends that this issue could have been (and, in fact, was) raised much earlier; that the Plaintiffs have only themselves to blame for its late re-emergence because they voluntarily withdrew the earlier motion to compel and did not schedule the crucial depositions until weeks before the close of discovery; and because there are no special circumstances justifying the untimely filing.

The Court noted above that none of the pretrial scheduling orders provided that discovery motions had to be filed within the discovery period. That language is in this Magistrate Judge's standard Rule 16 order, but that is not who issued the initial scheduling order in this case. Even if that language had been used (which contains an exception based on impracticality) or if the Court accepted the Hospital's reading of the case law, the Court believes that striking the motion is not appropriate.

If, in fact, no issue about peer review privilege arose following Plaintiffs' withdrawal of their earlier motion to compel, it may well have been reasonable for them to assume that the issue would not come up in the final few depositions. Further, even if the log should have alerted them that it might be an issue in Mr. Chambers' deposition, Ms. Hiatt's name appeared nowhere on the log. Additionally, it is not at all evident to the Court that an employee who dealt in customer satisfaction might be considered part of a peer review process. Finally, the Court agrees with Plaintiffs that in the context of attempting to work out a solution to the problem and moving to extend discovery, Plaintiffs acted promptly enough to undercut any argument that they were dilatory to the point of forfeiting their right to seek a ruling on this issue. For all of those

reasons, the Court will deny the motion to strike.

## V. Peer Review or Quality Assurance Privilege

The fundamental disagreement between Plaintiffs and the Hospital is over whether this particular privilege applies to claims brought under federal law. The Hospital argues that it should, notwithstanding prior decisions from this Court (and this Magistrate Judge) to the contrary, and that even if it is inapplicable to some types of federal claims, it applies to the claims presented here. Plaintiffs take issue with both these propositions. Before resolving that issue, the Court will summarize the factual basis for the Hospital's claim of privilege - something which, as Plaintiffs point out, they were prevented from delving into at Ms. Hiatt's deposition because she was instructed not to answer any questions about the process by which she was ultimately told how to respond to Ms. Thomas's letter.

### A. The Hospital's Peer Review Process

The only factual submission the Hospital makes on this issue is a declaration from Dr. Richard J. Brilli. It is attached as an Exhibit to Doc. 128. Dr. Brilli, who is the chief medical officer at the Hospital, states in his declaration that the Hospital has several peer-review committees which have, as their mission, "improving quality of care or competency of care provided and monitoring improvements in overall safety and patient care." Id., ¶3. One of those committees reviews quality of care issues reported by patients. The evaluation of patient grievances and complaints occurs within the CS STARS system, and access to that system is limited.

He explains in this way how the system works. If a patient makes a complaint or submits a grievance, that complaint is logged into the CS STARS database and forwarded to someone in the Quality Improvement Services Department. That person then forwards the complaint to the "departmental or physician

-9-

leadership within the involved department...." ¶10.  Other input may be solicited as well from persons like Performance Improvement Coordinators or Family Relations Coordinators.  ¶12.

Dr. Brill then states that Ms. Hiatt was, at the relevant time, a Performance Improvement Coordinator in the Emergency Department, and that she worked on behalf of a peer review committee which reviews patient grievances.  Shawn Chambers held a different job title, Family Relations Coordinator, but he did the same type of work.  All of the discussions with either Ms. Hiatt or Mr. Chambers about a patient grievance would take place within the CS STARS system and would involve a particular quality assurance committee.  All of the physicians who are asked to provide input into resolving a patient grievance are assured that their input will be kept confidential.  Dr. Brilli states that these assurances are "necessary for honest feedback" and that if they were not given, people would not be as forthcoming in the process.  That effect would occur if information were disclosed in a federal court, and it would diminish the Hospital's ability to "identify and implement potentially life-saving changes, putting overall safety and patient care at risk." ¶27.  Finally, he confirms that the letter written by Ms. Thomas, and responded to by Ms. Hiatt, went through this process.  ¶29.

### B. The Relevant Correspondence

At this point, it is helpful to explain just what the concerns were which Ms. Thomas expressed in her letter and which Ms. Hiatt addressed in her response.  Ms. Thomas (and her husband Daniel) wrote the letter in question on August 14, 2013.  See Doc. 114, Ex. 1.  The letter referred to the Emergency Room visit of May 23, 2013, and said that the child had been brought in for x-rays of his hip and leg at the suggestion of his primary care physician.  Ms. Thomas pointed out that a number of additional tests, which she viewed as unnecessary, were run and done without

her consent, and that she was also told to bring a different child in for tests.  She asserted that the tests were described inaccurately when her insurance company was billed for them and she disputed her or her insurer's obligation to pay for them.  Finally, she asked for an "honest explanation" of why these tests were performed.  As noted above, Ms. Hiatt responded on December 6, 2013, that the treatment given was "clinically appropriate" and that it "followed our hospital procedures as well as those mandated by the State of Ohio."  Doc. 114, Ex. 2.  Neither the Thomas letter nor the response made any mention of the quality of the care provided or the competency of the physicians involved.

### C. Ohio's Peer Review Privilege

The next step in the analysis is to determine the scope of the peer review privilege which the Hospital asserts.  Obviously, if the privilege is not broad enough to cover the subjects raised in the Thomas letter, there is no need to reach the issue of whether the Court should apply it in this case.

The privilege in question is codified at O.R.C. §2305.252.  This is the most relevant language in the statute:

> Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider, including both individuals who provide health care and entities that provide health care, arising out of matters that are the subject of evaluation and review by the peer review committee. No individual who attends a meeting of a peer review committee, serves as a member of a peer review committee, works for or on behalf of a peer review committee, or provides information to a peer review committee shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the proceedings of the peer review committee or as to any finding, recommendation, evaluation, opinion, or other action of the committee or a member thereof.

-11-

O.R.C. §2305.252(A).

The term "peer review committee" is defined in O.R.C. §2305.25(E)(1) as

> a utilization review committee, quality assessment committee, performance improvement committee, tissue committee, credentialing committee, or other committee that does either of the following:
>
> (a) Conducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care;
>
> (b) Conducts any other attendant hearing process initiated as a result of a peer review committee's recommendations or actions.

As this statutes plainly states, such a committee, in order to qualify, must conduct proceedings which involve one of three things: (1) the competence of a health care provider; (2) the professional conduct of such a provider; or (3) the quality of care given by a provider.  As the Ohio courts have said,"[t]he purpose of the statute is to protect the integrity of the peer-review process in order to improve the quality of health care."  See Smith v. Cleveland Clinic, 197 Ohio App.3d 524, 529 (Cuyahoga Co. App. 2011).  That case also notes that this privilege, being in derogation of the common law, "must be strictly construed against the party seeking to assert it and may be applied only to those circumstances specifically named in the statute."  Id. at 528.  The Court also notes that a reasonable construction of the statute is that it applies only to activities that are actually peer review proceedings (which, in the words of the statute's consist either of credentialing or "quality review activities"), and not to every activity that a hospital might

-12-

label as "peer review." As the Supreme Court of Connecticut has said, construing a very similar statute, "[s]imply because a hospital committee is a medical review committee does not suggest that all of its activities are considered peer review proceedings"). Babcock v. Bridgeport Hosp., 251 Conn. 790, 822 (1999). See also Lee Medical, Inc. v. Beecher, 312 S.W.3d 515, 536 (Tenn. 2010)(the purpose of the peer review privilege is not "to shield essentially every decision made by a hospital from appropriately managed discovery in a civil case").

It is apparent from the Thomas letter that the Thomases were not questioning either the competence of any of the health care providers who performed the procedures in question or the quality of those procedures. Rather, the clear thrust of the letter was to question why the procedures were performed in the first place and why the billing descriptions were, in the Thomases' view, inaccurate and deceptive. If these subjects are covered by the statute, they must be both construed as questions about the "professional conduct" of a health care provider and have become part of a "quality review" activity.

There is a substantial argument to be made that the letter did not bring into question the quality of the "professional conduct" of any individual health care provider. Rather, it questioned the Hospital's procedures (as opposed to health care decisions made by any individual provider) which led to the tests being performed and the way in which the Hospital represented those services on the bill sent to the Thomases' insurer. Surely, an administrative decision made by a hospital about how to describe medical procedures to an insurer cannot reasonably be characterized as part of a quality review process. And, in the Court's view, asking why particular procedures were ordered, absent any allegation they were performed less than competently – and being told that the procedures were mandated by state law –

-13-

does not call into question the professional competence of any of the doctors or nurses, because it appears that they did not make the decision to perform those procedures.  That is especially so with respect to the Thomases' question about why their other child was called in for tests; that could not have been a medical decision made by an individual provider, but an administrative decision made by the Hospital either because it believed that the tests were mandated by state law or because, as Plaintiffs allege, the Hospital had made an agreement with other governmental agencies to request and perform such tests whenever there was a suspicion about abuse of another child in the same family.  In short, there appears to the Court to be much in the processing of the Thomases' complaint which had nothing to do with traditional peer review activities or with reviewing the quality of the work of a health care provider.  The letter really was asking how the Hospital made administrative decisions about what to do when confronted with suspicions of child abuse and how to describe such procedures, and why it made the decision to bill those procedures to the affected families and their insurers.  Such matters cannot be shielded from discovery simply because the Hospital decided to entrust the processing of such matters to a committee which also performs peer review.  Were that not the case, a health care facility could simply delegate all of its functions to "peer review" committees and then invoke the privilege to shield the details of even its administrative or financial operations from discovery.  But that appears to be what occurred here, and Ms. Hiatt should have been permitted to answer not only the foundational questions which counsel sought to ask about the process itself - which were proper in order to determine if the activity she engaged in was actually peer review in any sense - but also questions about any part of the process which did not involve determining if any provider had acted

professionally or competently.

Rather than rest the entire decision on the fact that, for the most part, the peer review privilege does not cover a process which answers questions about either billing practices or mandated investigatory procedures, the Court will also briefly address the issue of whether the privilege should be applied at all in this case.  This Court has already decided the privilege does not exist in federal law and that there are no compelling reasons to apply it when information otherwise protected by the privilege is needed in order to support a valid claim asserted under federal law.  See, e.g., Guinn v. Mount Carmel Health Systems, 2010 WL 2927254 (S.D. Ohio July 23, 2010)(Kemp, M.J.), citing, *inter alia*, Nilavar v. Mercy Health System–Western Ohio, 210 F.R.D. 597 (S.D. Ohio 2002).  The Hospital argues that although that may be an appropriate ruling in cases where the allegations do not sound in medical malpractice, such as antitrust or employment discrimination cases, this case is different.  The Court disagrees.

As the Court's review of the complaint shows, there is no state law medical malpractice claim asserted against either the Hospital or any individual health care provider.  Further, the constitutional claims are not predicated on any inadequacy in the treatment provided, but rather on the performance of procedures which were ordered not based on the medical conditions of the children involved, but rather carried out under an agreement that the Hospital would collect information which might be used by law enforcement agencies without protecting the patients' constitutional rights.  Simply put, this is neither a malpractice case nor a case where the constitutional deprivations are predicated upon malpractice - as, for example, would be true of a prison inmate's claim for the denial of adequate medical treatment under the Eighth Amendment.  Consequently, the Court

need not decide if the peer review privilege should be recognized in a case where the federal claims are based on malpractice, because this is not such a case.

A final observation is in order.  The Court understands fully the concern that if a health care provider believes that his or her input into a peer review process may not be kept in confidence, the provider may well be reluctant to participate fully in the process, and that can impact the quality of health care given to patients.  When the subject of a hospital inquiry is not, however, whether a doctor or nurse failed to provide adequate care or made some type of error, but rather what administrative decisions led the hospital to conduct (or ask to have a child brought in so it can conduct) specific procedures or to decide to bill them to the patient or describe them in a certain way on the bill, it is hard to see how any individual's reluctance to answer such questions would impact the quality of the care provided to patients in a similar situation.  That is why the peer review privilege, when it applies, covers only quality review proceedings and not other types of hospital functions.  Consequently, entirely apart from the fact that federal courts generally do not recognize this privilege, the Court believes that not applying it to this particular situation will not undermine the Hospital's ability to provide quality care to its patients.

## VI.  Order

For the reasons set forth above, the Court makes the following orders.  First, the motion to compel (Doc. 120) is granted and the motion to strike (Doc. 121) is denied.  Second, the motion to vacate deadlines (Doc. 111) is granted to this extent.  Notwithstanding the existing discovery cutoff date, Plaintiffs may conduct additional discovery to include a resumed deposition of Ms. Hiatt and a deposition of Mr. Chambers.  The

Hospital shall, within 14 days, produce any documents previously withheld on grounds of peer review privilege as they relate to either Ms. Hiatt's or Mr. Chambers' investigation of any inquiries, complaints, or grievances submitted by the Plaintiffs. All discovery about this matter shall be completed within 30 days of the date of this order. All costs (but not attorneys' fees) associated with the reconvening of Ms. Hiatt's deposition shall be borne by the Hospital, but the Court does not otherwise make any fee award in connection with the motion to compel.

VII. Motion for Reconsideration

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a). The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

/s/ Terence P. Kemp
United States Magistrate Judge