# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DANIEL THOMAS, et al.,**

     **Plaintiffs,**

     **v.**

**NATIONWIDE CHILDREN'S HOSPITAL, et al.,**

     **Defendants.**

**Case No. 2:14-cv-01236**

**CHIEF JUDGE EDMUND A. SARGUS, JR.**

**Magistrate Judge Terence P. Kemp**

## OPINION AND ORDER

This matter is before the Court on the Motions for Summary Judgment of Defendants Nationwide Children's Hospital, the Center for Family Safety and Healing, the Center for Child and Family Advocacy, Dr. Farah Wadia Brink, Dr. Jonathan Thackeray, and Dr. Corey Rood ("Children's Defendants") (ECF No. 155) and Franklin County Children Services ("FCCS") (ECF No. 156). Plaintiffs have filed a combined Memorandum in Opposition to Defendants' Motion for Summary Judgment (ECF No. 181.) The Children's Defendants and FCCS filed their Replies (ECF Nos. 183, 184) on April 10, 2017, and the matter is ripe for consideration. For the reasons that follow, Defendants' Motions for Summary Judgment (ECF Nos. 155, 156) are **GRANTED.**

### I.  BACKGROUND

#### A.  The Plaintiffs

The Plaintiffs are three families, the Thomases, the Rose-Moores, and the Burleys. These parents brought newborn or infant children for treatment at the Emergency Department of

Nationwide Children's Hospital ("NCH") in Columbus, Ohio.[1]  These three children were six months old or younger at the time they were brought to the Emergency Department for treatment, and are sometimes referred to by the medical providers as the "index children," to differentiate them from siblings who were seen for evaluation at NCH.

### 1. The Thomas Family

Anna and Daniel Thomas's son, Evan, was three months old when he was brought to the Emergency Department at NCH for treatment on the night of May 23, 2013.  Emergency Department doctors asked them to bring in Evan's sibling, Samuel, aged twenty-two months, so that he could also be examined.  The Thomases brought Samuel as requested, "in the early morning hours of May 24, 2013." The parents assert that "[w]ithout parental consent, or justification, the two children were subjected to high doses of ionizing radiation and insertion of needles in their bodies while Anna Thomas looked on in fear and confusion," and that "the intrusions into the boy's [sic] bodies has [sic] caused severe, long-term consequences for the children and their mother." (Compl., ECF No. 17, at ¶ 1.)

### 2. The Rose-Moore Family

Jessica Rose and Russell Moore's daughter, Gabriella, was six months old when she was brought to the Emergency Department at NCH on the night of April 19, 2014.  No siblings were reported.  She was admitted to the hospital.  The parents assert that "[w]ithout parental consent, or justification, the child was subjected to high doses of ionizing radiation and insertion of needles in her body while the mother looked on in fear and confusion," and that "her further detention as an

---

1 Pursuant to Rule 5.2(h) of the Federal Rules of Civil Procedure, Plaintiffs have waived the redaction requirements of the Rule and consent to the identification of their children by name in any

inpatient; the subsequent skeletal x-rays; and the intrusions into the privacy of the child's body has caused severe, long-term consequences for the children and parents." (Compl., ECF No. 17, at ¶ 3.)

### 3. The Burley Family

Lori and Chad Burley's son, Luke, was 19 days old when he was brought to the Emergency Department at NCH for treatment on the night of July 27, 2014. Emergency Department doctors asked them to bring in their children, Suzanna, Jacob, and Lillian, ages six years old and younger, so that they could also be examined. The parents did so. The parents contend that "[w]ithout parental consent, or justification, the children were subjected to high doses of ionizing radiation and insertion of needles in their bodies while their mother and father looked on in fear and confusion," and that "the intrusions into the privacy of the children's bodies has caused severe, long-term consequences for the children and their parents." (Compl., ECF No. 17, at ¶ 2.)

### B. The Defendants

Plaintiffs bring suit against "Nationwide Children's Hospital, the Center for Child Advocacy and Healing at Nationwide Children's Hospital and The Center for Family Safety and Healing" asserting that they are "not-for-profit corporations organized under the laws of the State of Ohio . . . ." (Compl., ECF No. 17, at ¶ 4.)

Plaintiffs also bring suit against several medical doctors. They sue Dr. Jonathan Thackeray, "in his individual and official capacities" as formerly "Executive Director of The Center for Family Safety and Healing, acting under authority of the Nationwide Defendants" and as "the final decision maker representing the Nationwide Defendants in formulating and authorizing illegal actions taken against the Plaintiffs as set forth herein." (Compl., ECF No. 17, at ¶ 5.) Additionally, Plaintiffs

---

pleading or other document filed with the Court. (ECF No. 33, at p. 9.)

3

bring suit against Dr. Farah Brink and Dr. Corey Rood, "fellows at The Center for Family Safety and Healing, acting for and under the authority of the Nationwide Defendants, and authorized the illegal actions taken against the Thomas family as set forth herein. They are sued in their individual and official capacities." (Compl., ECF No. 17, at ¶ 6.)

The last defendant is the "Board of Trustees, Franklin County Children Services" as "the duly organized body responsible for the actions of the employees of the agency as set forth herein. All actions taken were in conformance with the agency's policies, practices and customs . . . ." (Compl., ECF No. 17, at ¶ 7.)

After the Children's Defendants and FCCS filed their motions for summary judgment, the Plaintiff families advised the Court that they will not proceed on six of the nine claims brought in their amended Complaint, including all of the claims brought under state law. *See* Pl.'s Mem. Opp. (ECF No. 181, p. vii.) Thus, the Plaintiffs proceed "only on their claims for Fourth Amendment violations (Count Five of the First Amended Complaint), for violations of the parents' familial association rights (Count Seven), and for declaratory and injunctive relief based on these violations (Count Nine)." (*Id.*)

## II. FACTS

The following facts are not disputed.

### A. NCH and the Named Physicians

NCH is a private pediatric hospital in Columbus, and its designated corporate representative for this litigation was Dr. Jonathan Thackeray, a medical doctor board-certified in both Pediatrics and Child Abuse Pediatrics, and the former Chief of the Division of Child and Family Advocacy, and

4

former Medical Director of the Center of Family Safety and Healing at NCH.[2] (Children's Def. Mot. Summ. J., ECF No. 155, at p. 15, n. 16.) Dr. Thackeray stated that the hospital provides "family centered care" and focuses "on the family's needs, as well as the child's, to promote and maintain the health of the child in the context of the family and community." (Thackeray Aff., ECF No. 155-10, ¶ 2.) Dr. Thackeray explained that "[c]hild abuse is a recognized medical diagnosis." (*Id.* at ¶ 6.) NCH has a Child Assessment Team ("CAT"), which is a consulting service that includes "Child Abuse Pediatricians and social workers who provide medical consultations for patients in the hospital with injuries suspicious for child abuse." (*Id.* at ¶ 9.) The consultation may be made by phone, "or may involve the Child Assessment Team examining the child and speaking to the family." (*Id.* at ¶ 10.)

Dr. Thackeray's involvement with the three Plaintiff families was through the Child Assessment Team at NCH. (*Id.* at ¶ 8.) Dr. Brink and Dr. Rood were Child Abuse Pediatrician Fellows under the supervision of Dr. Thackeray, who was the Child Assessment Team Attending Physician on duty when the CAT was consulted by the treating physicians in the Emergency Department. (*Id.* at ¶¶ 11-12, 28-29.)

**B. The Injuries Presented**

It is undisputed that between 2013 and 2014, the three Plaintiff families brought infant children to be treated at the Emergency Department of Nationwide Children's Hospital for very serious injuries: Evan, a three month-old infant, was treated for a fractured femur; Gabriella, a six month-old infant, was treated for a skull fracture and right distal ulnar fracture; and Luke, a 19 day-

---

2 Dr. Thackeray provided deposition testimony as NCH's designated witness under Fed.R.Civ.P. 30(b)(6). Plaintiffs did not depose Dr. Thackeray in his personal capacity. Furthermore, Plaintiffs

old infant, was treated for two skull fractures, one on each side of his head. (*Id.* at ¶¶ 14, 22, and 27.) In each case, NCH and its physicians diagnosed and provided medical treatment for the injuries, and at least one parent of each child consented to the treatment, and was present in the hospital for all medical tests and treatment performed by the hospital. (*Id.* at ¶ 33.)[3]  Additionally, Dr. Thackeray stated that the medical standard of care "requires physicians to recommend that young siblings of suspected child abuse victims be evaluated for medical purposes to determine whether they are also suffering from child abuse, which is a medical diagnosis." (*Id.* at ¶ 16.)

### 1. Evan Thomas's injury

On May 23, 2013, three-month-old Evan was brought to the NCH Emergency Department with a fractured femur. Dr. Elizabeth Claxton, a Board Certified Pediatric Emergency Medicine Physician, was the attending physician in the Emergency Department of NCH assigned to Evan. (Claxton Aff., ECF No. 155-5, at ¶¶ 1-3.) She stated that the "facture was proximal, suggesting that the injury could have been caused by torqueing, meaning a turning or twisting force, which is a common mechanism of injury in child abuse victims." (*Id.* at ¶ 4.) Dr. Claxton explained that she "and the other medical professional treating Evan Thomas recommended consistent with the standard of care, that his siblings, under the age of two also be seen and examined in the emergency

---

do not contest the evidence provided in Dr. Thackeray's affidavit.

3 None of the Plaintiff children was seen or treated at the Center for Family Safety and Healing, an accredited Child Advocacy Center and a separate corporation from NCH, which "primarily provides resources and social services to individuals and families affected by child sexual abuse, and those affected by all forms of family violence...." (Thackeray Aff., ECF No. 155-10, at ¶¶ 39, 40, 42.) There are no allegations that any of the Plaintiff children were victims of sexual abuse. (*Id.* at ¶ 42.) Jennifer Voit, formerly the Vice President of the Center for Family Safety and Healing, testified that "[t]he policies, procedures, and agreements utilized at the Center, and the FCCS MOU do not apply to patients in the Emergency Department at Nationwide Children's Hospital, or to inpatients in the hospital." (Voit Aff., ECF No. 155-17, ¶ 12.) Thus, Plaintiffs' allegations of a conspiracy involving

room to determine whether they had any signs or symptoms of child abuse, which is a medical diagnosis." (*Id.* at ¶ 14.) Dr. Claxton further stated that "[t]he medical tests and treatments provided to the siblings were also medically necessary and performed for medical purposes. None of the tests performed on any of the minor plaintiffs were performed for investigatory purposes." (*Id.* at ¶ 18.) Dr. Thackeray was the attending physician for the CAT team, and he explained further that "[t]here had been a delay in seeking treatment for the injury, and this type of fracture in a non-ambulatory child is highly suspicious for a diagnosis of child abuse. Additionally, the mother's story regarding how the injury occurred did not indicate the type of force that would be needed to break this bone in an infant." (Thackeray Aff., ECF No. 155-10 at ¶ 14.) Dr. Farah Brink, the Child Abuse Pediatrician Fellow on duty, was consulted by the Emergency Department treating physicians on Evan's case, and Dr. Thackeray agreed with Dr. Brink's medical recommendations. (*Id.* at ¶¶ 11-13.) Specifically, Dr. Thackeray "agreed with Dr. Brink's assessment and the assessment of the Emergency Department physicians, Dr. Claxton, and Dr. Little that Evan Thomas' injury was reasonably suspicious for child abuse. [Dr. Thackeray] further agreed with their recommendations that Evan's 23 month old brother, Samuel, should also be seen and examined in the Emergency Department." (*Id.* at ¶ 15.)

"The Emergency Department physicians and social workers appropriately reported their reasonable suspicions of child abuse to Franklin County Children's Services ("FCCS"), and requested and completed examinations of the sibling of Evan, as appropriate and within the standard of care for treatment of suspected child abuse." (*Id.* at ¶¶ 17-18.) Dr. Thackeray never spoke with

---

the Center for Family Safety and Healing are inapposite. (Compl., ECF No. 17, at ¶ 15.)

Evan's family directly, but rather was consulted by the Emergency Department physicians. (*Id.* at ¶¶ 18-19.)

### 2. *Gabriella Rose-Moore's injury*

On April 19, 2014, six-month-old Gabriella was brought to the NCH Emergency Department with a skull fracture. "The parents reported that four days prior, Gabriella had been left on a table in her bumbo seat, and had fallen from the table.[4] The mother reported that she found Gabriella lying on her right side after the fall. Gabriella's fracture was on the left side of her skull. The parents' story was inconsistent with her injury, and there was a four day delay in seeking treatment." (Thackeray Aff., ECF No. 155-10, at ¶¶ 27-30.) Dr. Corey Rood, the Child Abuse Pediatrics Fellow on duty for the Child Assessment Team, was consulted by the Emergency Department treating physicians on Gabriella's case, and Dr. Thackeray agreed with Dr. Rood's medical assessment and recommendations for tests and treatment. (*Id.* at ¶¶ 28-29.) "The Emergency Department Staff appropriately reported their reasonable suspicions of child abuse to the Franklin County Children's Services." (*Id.* at ¶ 31.)

Dr. Sandra Cockerham, a Board Certified Pediatric Emergency Medicine Physician, was the attending physician in the Emergency Department when Gabriella was brought in for treatment. She explained in her affidavit that "[d]elay in seeking treatment is an indicator of the medical diagnosis of child abuse, and Gabriella Moore's parents had waited four days to seek care for her injury." (Cockerham Aff., ECF No. 155-13, at ¶ 6.) "The combination of these factors, as well as the

---

4 "A Bumbo seat is a one-piece seat made entirely of a low density foam, with a deep seat and high back and sides, and openings for the legs as well [as] a front support and a safety buckle. The Bumbo seat is marketed to help babies sit upright before they are physically able to support themselves in that position." (Children's Def. Mot. Summ. J., ECF No. 155, at p. 10, n. 9.)

additional finding of an ulna fracture, led us to reasonably suspect that Gabriella Moore was the victim of child abuse or neglect and thus a mandatory report was required to be made to Franklin County Children's Services and the Columbus Police Department." (*Id.* at ¶ 7.) Gabriella "was admitted to the hospital due to the seriousness of her injuries." (*Id.* at ¶ 16.)

### 3. Luke Burley's injury

On July 27, 2014, 19-day-old Luke was admitted to the hospital with a skull fracture on each side of his skull. (Thackeray Aff., ECF No. 155-10, at ¶¶ 21-22.) The Child Assessment Team received a consult to examine Luke on July 28, 2014, and Dr. Thackeray was the Child Abuse Pediatrician who responded to the consult request. (*Id.*) Dr. Thackeray examined Luke and spoke with his mother, who reported that Luke had fallen 10 days earlier. (*Id.* at ¶ 23.) Dr. Thackeray stated that the report "would not account for the significant fractures seen – specifically the right parietal displaced fracture. Further, we would not expect swelling to appear as dramatically as it did 10 days after the event." (*Id.*) Dr. Thackeray stated that "[d]uring our discussions with the mother, she also revealed that she had lost custody of three other children due to suspected child abuse and that those children were placed in the permanent custody of their grandmother." (*Id.* at ¶ 24.) Dr. Thackeray further stated that, after examining Luke and speaking with Luke's mother, he "felt that the findings were highly suspicious for physical abuse, as the history provided was not plausible to support the type of injury sustained by the child." (*Id.* at ¶ 25.)

Dr. Julia Lloyd, a Board Certified Pediatric Emergency Medicine Physician, was the attending physician in the Emergency Department at NCH when Luke was brought to the hospital with head swelling. She stated that neither parent could explain how the injury occurred, but Luke's father speculated that it may have occurred when the newborn rolled off the sofa 10 days earlier.

9

(Lloyd Aff., ECF No. 155-4, at ¶¶ 5-6.) Dr. Lloyd explained that "[t]he fact that the only potential cause provided by either parent was an event that occurred ten days earlier suggested a delay in seeking care, which is a common indicator of the medical diagnosis of child abuse." (*Id.* at ¶ 7.) Prior to consulting Dr. Thackeray, the Emergency Department staff had reported their "reasonable suspicions of child abuse to Franklin County Children's Services, and ha[d] requested and completed examinations of the siblings of Luke Burley, as appropriate and within the standard of care for treatment of suspected child abuse." (Thackeray Aff., ECF No. 155-10, at ¶ 26.)

## C. Expert Opinion

The Children's Defendants have offered the reports of three medical expert witnesses: two expert witnesses in the field of Child Abuse Pediatrics, and an expert in Pediatric Radiology. These expert witnesses prepared reports, and testified to the medical standard of care provided by NCH and the physicians in this case. These experts reviewed the medical records of the children and opined that the standard of care was met for each of the child plaintiffs in this case, including the siblings of the index children, and that all of the medical testing was appropriate and necessary and within the standard of care. Further, Dr. Pollock, a radiologist with a specialty in pediatric radiology, opined that the level of radiation each child was exposed to was at or below the acceptable dose range set forth by the American College of Radiology. *See* Expert Reports of Dr. Avrum Pollock (ECF No. 155-2, at p. 4); Dr. Robert Shapiro (ECF No. 155-3); and Dr. Daniel Lindberg (ECF No. 155-12). The evidence presented by these expert witnesses is uncontested. (*See* Children's Def. Mot. Summ. J., ECF No. 155, at p. 15, n. 17.)

10

## D. Franklin County Children Services

Franklin County Children Services ("FCCS") is a public children services agency. (FCCS Mot. Summ. J., ECF No. 156, at p. 3.) It is uncontested that under Ohio law, physicians have a legal duty to report reasonable suspicions of child abuse or neglect to children's services or law enforcement agencies. The duty to report is set forth in O.R.C. § 2151.421(A)(1)(a) and (b). Physicians who have reasonable cause to suspect that an injury may indicate abuse must "immediately report that knowledge or reasonable cause to suspect" to the public children services agency or municipal or county peace officer where the child resides.[5]

FCCS asserts that its role upon receipt of a report of suspected abuse is established by Ohio law as follows:

> Upon receipt of a report of suspected abuse, a PCSA must investigate that report within twenty-four hours to determine the circumstances surrounding the injuries, abuse, or neglect and the person(s) responsible. O.R.C. § 2151.421(F)(1). That investigation is required to be conducted "in cooperation with the law enforcement agency," and the PSCA is required to submit a written report of its investigation to law enforcement. *Id.* The investigation must be conducted pursuant to the memorandum of understanding "MOU" required of each PCSA pursuant to O.R.C. § 2151.421(J). *Id.* The required MOU must be signed by numerous public entities and officers, O.R.C. § 2151.421(J)(1)(a)-(i), and must generally set-forth the procedures to be followed in conducting the investigations under O.R.C. § 2151.421. O.R.C. § 2151.421(J). The MOU created by FCCS as required under this section is Exhibit 1 to the Second Amended Complaint, Doc. # 17-1 and 17-2, Page ID 345-393 (the "FCCS MOU")....

(FCCS Mot. Summ. J., ECF No. 156, at p. 4.)

---

[5] Persons with the obligation to report suspected abuse (often referred to as "mandatory reporters") are immune from any civil or criminal liability for complying with the statutory mandate, as provided in O.R.C. § 2151.421(H)(1)(a).

Ms. Lara Laroche, the Director of Intake for FCCS, testified at deposition and provided an affidavit explaining the role of FCCS in conducting investigations. (Laroche Aff., ECF No. 156-1.)[6] She stated that a "safe discharge plan" is separate from a physician's determination of when to medically discharge a patient, and that FCCS had no role in any of the medical decisions in this case. Additionally, she testified in her affidavit that none of the Plaintiff children were referred to or treated at the Center for Family Safety and Healing.[7]

> 6.) None of the Plaintiffs in this case were referred to or treated at the Center for Family Safety and Healing ("the Center"), thus neither the MOU for the Center nor the protocol attached to that MOU applied to the investigations of the reports of suspected abuse at issue in this case. FCCS caseworkers who are co-located at the Center did not participate in these investigations.

> 7.) Other than in cases where FCCS has legal custody of a child, where a child is receiving medical treatment at Nationwide Children's Hospital ("NCH"), or any other medical facility, FCCS does not in any way direct or provide input regarding the medical treatment of that child by the medical professionals. All decisions related to the provision of medical treatment are reserved exclusively to the medical professionals.

> * * *

> 10.) Executing a safety plan with parents, and "discharge planning" or a "safe discharge plan," are actions taken exclusively by FCCS to protect children from an identified safety threat. These actions or concepts are completely separate from a medical discharge, which is exclusively reserved to the medical professionals.

> 11.) All safety plans are created and executed on a completely voluntary basis with the consent of the parents and all other participants in the plan.

---

6 Attached to her affidavit is a copy of the FCCS Consumer Rights and Information booklet that is given to persons at their first interview with a FCCS caseworker. Ms. Laroche stated that FCCS has no input into the medical treatment of a child unless that child is in FCCS's official legal custody. (*Id.*, at ¶ 7.)

7 Plaintiffs sued Dr. Thackeray as "Executive Director of the The Center for Family Safety and Healing, acting for and under authority of the Nationwide Defendants." (Compl., ECF No. 17, at ¶ 5.) Plaintiffs assert that "NCH's claim that the Center for Family Safety and Healing was not 'directly involved in [the Thomas] investigation' implies that it was involved, just indirectly." (Pl.'s Opp., ECF No. 181, at p. 29.)

12.) FCCS had no input whatsoever into the creation or implementation of any protocols utilized by NCH or the NCH Emergency Department medical staff in the medical treatment of children in cases of suspected child abuse. Those protocols are within the exclusive domain of the medical professionals. How to medically treat such cases and/or what treatment is necessary or indicated are decisions made by the medical professionals at NCH.

(*Id.* at ¶¶ 6-7, 10-12.)

FCCS asserts that the FCCS MOU (and its specific content) is required pursuant to O.R.C. § 2151.421(J). (FCCS Mot. Summ. J., ECF No. 156, at p. 21.) "The stated purpose of the MOU is to 'delineate clearly the role and responsibilities of each official or agency' in assessing or investigating child abuse in Franklin County." (*Id.*) FCCS further asserts that "[t]he FCCS MOU does not address or contemplate the provision of medical treatment or the medical testing of alleged child victims by medical professionals at medical facilities like NCH, and certainly does not direct or authorize FCCS to intervene or have any input into such medical treatment or testing." (*Id.*, citing FCCS MOU, ECF No. 17-1, 17-2, Page ID # 348.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party, who

13

"must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). However, the Sixth Circuit has explained that, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 257).

A genuine issue of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 486 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## IV. ANALYSIS

Plaintiffs' claims in Counts Five and Seven are brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects. . . any citizen. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

14

42 U.S.C. § 1983. The purpose of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *Carey v. Piphus,* 435 U.S. 247, 254–257, 98 S.Ct. 1042, 1047–1049 (1978). As the Supreme Court has explained, two elements must be met for the Plaintiffs to meet their burden of proof to establish a claim under Section 1983:

The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted 'under color of law.'

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970). The Supreme Court has noted that "[i]n cases under § 1983, 'under color' of law has consistently been treated the same as 'state action' required under the Fourteenth Amendment." *United States v. Price,* 383 U.S. 787, 794, fn. 7 (1966). Thus, Plaintiffs must prove "that the defendant has deprived him of a right secured by the Constitution and laws of the United States." *Id.* Plaintiffs must also prove that "the defendant deprived him of his constitutional right under . . . color of law." *Id.; see also Harville v. Vanderbilt Univ., Inc.,* 95 Fed. App'x 719, 726 (6th Cir. 2003) (dismissal of Plaintiffs' civil rights claim affirmed where Defendants were not acting under color of state law). In the case at bar, the Court does not need to reach the issue of whether the Defendants were acting under color of law, because Plaintiffs are unable to prevail on their allegations of constitutional deprivations.

## A. Fourth Amendment Violation (Count Five)

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants

15

shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Plaintiffs assert that "the NCH defendants violated their right to be free from unreasonable searches and seizures." (Pl.'s Mem. Opp., ECF No. 181, at p. 39.)   Count Five of Plaintiffs' complaint alleges the following:

122. When the Defendants took the actions they did, there were no exigent circumstances justifying actions without first presenting the facts to a neutral magistrate;

123. Defendants' actions, in conspiring to create, and in executing the collaborative data gathering for law enforcement purposes in this case was in reckless disregard of the Plaintiffs' rights under the Fourth and Fourteenth Amendments;

124. As a direct and proximate result, Plaintiffs suffered pain, exposure to radiation, injury to cellular DNA, and increased potential for the future development of cancer. Anna suffered emotion distress, and continues to experience injuries. . .

(Compl., ECF No. 17, at p. 26.) Plaintiffs assert that NCH conducted unreasonable searches and seizures because an "investigation of possible child abuse was at least one purpose of the testing it did." (*Id.*) In support of their assertion that their children were subjected to unreasonable searches and seizures, Plaintiffs cite the Tenth Circuit's decision in *Dubbs v. Head Start, Inc.,* 336 F.3d 1194 (10th Cir. 2003).

In *Dubbs*, the Court held that physical examinations of pre-school children enrolled in a Head Start program were "searches" subject to the protections of the Fourth Amendment. However, *Dubbs* is distinguishable for several reasons, including that fact that state action was not contested in that case. In *Dubbs,* the plaintiffs brought a civil rights action complaining that their pre-school age children, participants in the Head Start program in Tulsa, Oklahoma, were subjected to "intrusive

16

physical examinations, including genital examinations and blood tests, on school premises, without

parental notice or consent." *Id.* at 1197. The *Dubbs* Court explained that the "central disputed

issue" in the case was consent. In discussing the lack of parental consent, the Tenth Circuit stated

> It should go without saying that adequate consent is elemental to proper medical
> treatment. In medical procedures involving children, ensuring the existence of
> parental consent is critical, because children rely on parents or other surrogates to
> provide informed permission for medical procedures that are essential for their care.
> American Academy of Pediatrics, *Informed Consent, Parental Permission, and
> Assent in Pediatric Practice,* 95 Pediatrics 314–17 (February, 1995).
>
>            ***
>
> As already noted, the central disputed issue in this case is consent. It is well
> established that a search conducted pursuant to a valid consent is constitutionally
> permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36
> L.Ed.2d 854 (1973). Thus, if the trier of fact concluded that the parents in this case,
> on behalf of their minor children, actually consented to the examinations, there would
> be no Fourth Amendment violation. *United States v. Rith,* 164 F.3d 1323, 1330 (10th
> Cir.1999). Moreover, because the Fourth Amendment prohibits only "unreasonable"
> searches and seizures, the Supreme Court has held that the Amendment is satisfied
> when, under the circumstances, it is objectively reasonable for the official to believe
> that the scope of a person's consent permitted him to conduct the search. *Florida v.
> Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Illinois v.
> Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United
> States v. Osage,* 235 F.3d 518, 519–21 (10th Cir.2000).

*Id.* at 1207-1208. The *Dubbs* opinion supports the position of the defendants, insofar as consent

vitiates any Fourth Amendment claim.

The Children's Defendants assert that, in the case at bar, "[e]ven if a Fourth Amendment

search had occurred, it was supported by consent." (Children's Def. Reply, ECF No. 184, at p. 30).

FCCS likewise asserts that "[e]ven assuming that the medical tests performed on the children in this

case constituted 'searches' of their bodies for the purposes of the Fourth Amendment, those searches

did not violate the Fourth Amendment rights of the Plaintiffs because they were conducted with the

voluntary consent of the minor patients through their parents." (FCCS Mot. Summ. J., ECF No. 156, at p. 23.)

Unlike the factual scenario in *Dubbs*, it is not disputed in the case *sub judice* that the Plaintiff parents signed written general consent forms authorizing NCH's treatment of their children. (*See* Thackeray Decl., ECF No. 155-10, Attachments A-G, pp. 9-15.) The consent forms expressly provided consent to "do all things that may be needed to" medically treat the minor Plaintiffs. Each consent form states, in pertinent part:

> I and/or my parent(s) or guardians(s)* consent to let the doctors, nurses, and employees of Nationwide Children's Hospital, attending doctors and other doctors (or assistants/designees) or persons, do all things that may be needed to diagnose, treat and care for the needs of the above-referenced patient.

*Id.*

Furthermore, at deposition, Anna Thomas, Evan's mother testified:

> Q. And for each visit to Children's Hospital or its Urgent Care center, you or your husband signed a medical consent form?
> A. Yes, we did.
> Q. And you – did you read the consent form before signing?
> A. In all incidences, after we brought Evan in, we read things very carefully.

(Anna Thomas Dep., ECF No. 155-1, at p. 33.)

Likewise, Jessica Rose, Gabriella's mother testified as follows:

> Q. And specifically, did you read the very first paragraph under consent for medical treatment?
> A. Yes.
> Q. So you knew when you signed Exhibit 11 at the emergency department that you were consenting to Children's Hospital doing all things needed to diagnose, treat, and care for Gabriella's needs?
> A. Yes.
> Q. And that was okay with you, right?
> A. I didn't know the extent of it, but yes.
> Q. But you wanted your daughter to be taken care of?

18

A. Yes.

Q. That was – that was your highest priority, correct?

A. Yes.

Q. Even though you were, at that time, worried about Children Services involvement, it was more important to you that Gabriella get the care she needed to be okay?

A. Yes.

(Jessica Rose Dep., ECF No. 155-8, at pp. 75-76.)

And likewise, Lori Burley, Luke's mother, testified as follows:

Q. And did you understand that when you take your child to the doctor or to the hospital and ask them to treat your child, you're consenting to treatment that they give?

A. Yes.

(Lori Burley Dep., ECF No. 155-6, at pp. 75-76.)    Thus, it is undisputed that the Plaintiff parents signed consent forms consenting to the treatment their children at NCH. Ohio courts have held that "a physician's acts are lawful when the patient expressly consents prior to medical treatment." *Vignal v. Cleveland Clinic Found.*, No. 69603, 1996 Ohio App. LEXIS 4194, at *9 (Ohio Ct. App. Sep. 26, 1996).

Additionally, in contrast to the factual scenario in *Dubbs*, in the case at bar, one or both parents brought the children to NCH and were present at NCH while the child was receiving the medical treatment. Thus, the Children's Defendants rightly assert that, "[i]n addition to express consent, the adult Plaintiffs gave 'apparent consent' to the medical procedures and tests that were used to diagnose the minor Plaintiffs' medical conditions." (Children's Def. Mot. Summ. J., ECF No. 155, at p. 54.) The Supreme Court has made it clear that Fourth Amendment prohibitions "do[] not apply . . . to situations in which voluntary consent has been obtained." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); see also *Schneckloth*, 412 U.S. at 219 (same). As the Tenth Circuit stated in

*Dubbs*, "[i]t is well established that a search conducted pursuant to a valid consent is constitutionally permissible." *Dubbs*, 336 F.3d at 1207.

Plaintiffs have presented no evidence that they were ever informed that they were not free to leave, let alone that they were somehow coerced to permit the medical testing of their children. In fact, all of the parents expressed their consent to stay in order for their children to receive the medical care they needed. The Children's Defendants further assert that "[e]ven where express consent is not obtained, the Fourth Amendment is satisfied when it is objectively reasonable for the Defendants to believe that consent was given under the circumstances." (Children's Def. Mot. Summ. J., ECF No. 155, at p. 35, citing *Florida v. Jimeno*, 500 U.S. at 251; *Mallory v. City of Riverside*, 35 F.Supp.3d 910, 934 (S.D. Ohio 2014), quoting *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995) ("If the individual makes a claim of coercion or improper behavior as a means of trying to invalidate their consent, he or she must show 'more than a subjective belief of coercion, but also some objectively improper action. . .'".) Here, Plaintiffs cannot show that there was any objectively improper action that invalidated their consent.

Plaintiffs assert that NCH "deliberately conceals from caregivers that fact that a caregiver can refuse further testing of a child. These facts demonstrate that NCH serves a law enforcement investigation purpose when performing its evaluation in testing in cases of potential child abuse." (Pl.'s Opp., ECF No. 181, at p. 11.) Plaintiffs also assert that their consent was involuntary "because NCH did not disclose before the procedures that it was conducting state mandated investigations or following strict protocols required by state law to do so." (Pl's. Mem. Opp., ECF No. 181, at p. 41.) However, NCH was not required to do so. For example, in criminal cases, the Sixth Circuit has held that there is no requirement that the purpose of a search be disclosed prior to conducting the search.

20

*See, e.g., United States v. Lee,* 793 F.3d 680, 685 (6th Cir. 2015) (parole officers' failure to explain they were entering a parolee's home to search for weapons did not invalidate consent to enter). [8] Furthermore, in the case at bar, the testimony of the treating physicians and medical experts is that the medical tests done in this case were part of the medical standard of care in treating non-ambulatory, non-verbal children with severe and insufficiently explained injuries. All of the medical experts involved in this case testified that the standard of care requires evaluating the young siblings of children whose injuries are suspicious for abuse. As Dr. Lindberg explained, "[t]he recommendations and evaluations of the siblings in this case were medically necessary and were within the standard of care. Indeed, each recommendation and evaluation is well supported by national guidelines and the practices of other leading children's hospitals." (Lindberg Report, ECF No. 155-12, at p. 2.) Plaintiffs have produced no medical evidence that would support a finding that the medical treatment of the Plaintiff children was not for medical reasons.

Additionally, it is undisputed that none of the parent Plaintiffs made any objections to the medical tests and treatment their children received. Rather, Evan's mother testified that she did not object to any of the procedures, nor did she question any of the medical personnel about the procedures. (Anna Thomas Dep., ECF No. 155-1, at pp. 130-135, 137, 172-173.) Likewise, Gabriella's mother was in the room when the x-rays were performed on Gabriella, and she did not object to the procedures or ask that they be stopped. (Jessica Rose Dep., ECF No. 155-8, at pp. 79-81 ("A. We were actually in the room. Q. You were in the x-ray room with her? A. Yes.")) And finally, Luke's mother testified that she wanted doctors to draw blood, perform x-ray and CAT scans,

---

8 Furthermore, in determining the voluntariness of consent for purposes of the Fourth Amendment, the Supreme Court has held that police officers have no obligation to inform motorists that they are

and provide whatever care needed to fix the problem. (Lori Burley Dep., ECF No. 155-6, at pp. 75-77.)

Plaintiffs themselves have provided evidence of consent: medical consent forms signed by the Plaintiff parents; testimony by the Plaintiff parents that they did in fact consent to the medical treatment, and did not tell the doctors that they objected to the medical treatment of the children; and testimony by the Plaintiff parents conceding they were present with their children during medical treatment. Thus, in considering the evidence in the light most favorable to the Plaintiffs, the Court finds that no reasonable jury could find a lack of actual or apparent consent. Under these circumstances, Plaintiffs cannot meet their burden to show that a search or seizure occurred in violation of the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. at 222; *Florida v. Jimeno*, 500 U.S. at 251.

Furthermore, assuming *arguendo* that the medical treatment of the children constituted a "search or seizure", the Court is persuaded that any "search or seizure" of the children was justified by exigent circumstances. In determining whether exigent circumstances exist, the totality of the circumstances must be weighed. "Whether a Fourth Amendment search is reasonable 'depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). (See Children's Def. Mot. Summ. J., ECF No. 155, at p. 37.) These non-verbal, non-ambulatory infant children were brought to the Emergency Department with serious injuries: two with skull fractures, and one with a broken femur. The Sixth Circuit has explained that "[p]reventing imminent or ongoing physical abuse within a home qualifies as an exigent circumstance" and thus renders a search and seizure of

---

free to go before seeking consent to search their car. *See Ohio v. Robinette*, 519 U.S. 33 (1996).

the child "reasonable" without a court order or consent. *See Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010).

Because the Court finds that Plaintiffs are unable to prevail on their burden to prove that Defendants have deprived them of a right secured by the Constitution and laws of the United States, it is unnecessary to reach the other element of a Section 1983 claim, which is whether any such deprivation of rights was conducted under the color of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. at 150. The Children's Defendants and FCCS's Motions for Summary Judgment (ECF Nos. 155, 156) on Count Five are **GRANTED**.

### B. Violation of Associational Rights (Count Seven)

In their second claim pursuant to 42 U.S.C. § 1983, Plaintiffs assert that the Children's Defendants and FCCS violated their First, Fourth, Fifth, and Fourteenth Amendment rights, as follows:

> 133. Plaintiffs enjoyed the right of privacy arising from their associational rights as a family; the parents enjoyed the right of privacy to be given honest information regarding proposed medical testing of their children in order to evaluate whether or not to refuse such proposed testing; the children enjoyed the fundamental right to privacy and bodily integrity;
>
> 134. Defendants, in conducting the medical examinations and testing of the children; in seizing custody of LAB and GM for extended periods, without medical justification but solely for the purpose of detaining them to collect additional evidence for law enforcement purposes, without first submitting the demand to a detached magistrate, constituted violations of Plaintiffs' rights under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States;
>
> 135. Defendants' actions were in reckless disregard of Plaintiffs' federally-protected rights;

136. As a direct and proximate result, Plaintiffs have been charged with medical and hospital expense, suffered pain and physical suffering, humiliation, extreme emotional distress, and loss of enjoyment of life....[9]

(Compl., ECF No. 17, at pp. 28-29.)

As explained in Paragraph IV(A.) above, the evidence establishes that the Plaintiff parents consented to the medical treatment of their children at NCH. Additionally, the evidence is uncontested that one or both of the Plaintiff parents was present with their child throughout the medical procedures at NCH. Finally, the unrebutted medical evidence is that the medical tests were conducted for medical purposes in accordance with the standard of care for pediatric physicians. Thus, Plaintiffs' Fourth Amendment claims fail for the same reasons as discussed in Paragraph IV(A.) and need not be revisited.

The Court construes Plaintiffs' allegations under the First and Fifth Amendments as assertions that the Children's Defendants and FCCS violated Plaintiffs' right to familial association in violation of procedural due process. The Sixth Circuit considered a similar issue in *Kottmyer v. Maas*, 436 F.3d 684 (6th Cir. 2006). In that case, the Plaintiff mother gave birth to a baby with significant brain damage, and the baby was admitted to Cincinnati Children's Hospital Medical Center ("Hospital"). While there, Ms. Maas, a hospital social worker, met with the mother, and determined that it would be dangerous for the baby to be taken home. *Id.* at 687. The baby was "transferred to another medical facility, St. Joseph's Home," and then the County continued to investigate Plaintiffs. Plaintiffs alleged that the investigation was made by the County "despite receiving information from the medical staff treating Arianna that there was no basis for

_____

9 Two of the families were on Medicaid, and incurred no out of pocket costs for their children's medical care. The third family was billed for their insurance deductible, which was never paid.

investigating the Kottmyers." *Id.* Plaintiffs alleged that they were monitored and treated "like criminals." *Id.* After conducting an investigation for several months, the Hamilton County Department of Jobs and Families Services Children's Services Appeal determined that the Plaintiffs were not a danger to their baby. *Id.* The baby died two months later. Plaintiffs brought suit against the Hospital, Ms. Maas, Hamilton County, and Ms. Ayer, a Hamilton County Department of Jobs and Family Services social worker. *Id.*

The Sixth Circuit upheld the District Court's dismissal of the Section 1983 claims against two of the defendants, the Hospital and the hospital social worker, Ms. Maas, because the allegations in the complaint were insufficient to establish that the Hospital and Ms. Maas were "acting under the color of law at the time of the alleged constitutional violations." *Id.* at 688. The Court then addressed Plaintiffs' claims against the remaining defendants, Hamilton County and Ms. Ayer, and held that there was "no question that Ayer and Hamilton County were acting under of color of law." *Id.* at 689. Thus, the Court proceeded to analyze whether Plaintiffs' constitutional rights were violated. The Sixth Circuit explained that

> There is no doubt that under the constitution, the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law. *See, e.g. Bell v. Milwaukee*, 746 F.2d 1205, 1243 (7th Cir. 1984); *Morrison v. Jones*, 607 F.2d 1269, 1276 (9th Cir. 1979). Moreover, the Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship. In *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Court declared it "plain beyond the need for multiple citation" that a natural parent's desire for and right to the companionship, care custody and management of his or her children is an interest far more precious than any property right."

\*\*\*

---

NCH stopped pursuing collection of those bills. (Cindy Shaffer Aff., ECF No. 155-9, at pp. 1-2.)

Although it has recognized this abstract fundamental liberty interest in family integrity, however, the Supreme Court has yet to articulate the parameters of this right. Nevertheless, what is clear is that the right to family integrity, while critically important, is neither absolute nor unqualified. *Martinez v. Maychir*, 35 F.3d 1486, 1490 (10th Cir. 1994). The right is limited by an equally compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents. *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987).

\*\*\*

Having concluded that the right to familial association is circumscribed by the government's interest in protecting children from potential abuse, we must determine the right's applicability to this case. Namely, we must determine whether the right to familial association includes the right to be free from governmental investigation based on a potential risk of harm to the child. We conclude that the right to familial association is not implicated merely by governmental investigation into allegations of child abuse.

*Id.* at 689 - 690. The Court elaborated that "[a] parent is necessarily deprived of his or her right to custody and control of their child, either permanently or temporarily, when a child is removed from the home . . . [m]ere investigation by authorities into child abuse allegations without more, however, does not infringe upon a parent's right to custody or control of a child in the same manner." *Id.* at 691. Therefore, "Ayer's and Hamilton County's mere investigation of Maas's allegations of child abuse" did not violate Plaintiffs' right to familial association. *Id.* The holding of the Sixth Circuit is equally applicable here.

Having reviewed the facts, including the uncontested fact that the doctors expressed their opinions that the nature of the injuries of the Plaintiff children gave rise to a reasonable suspicion of child abuse, and the uncontested fact that the Plaintiff parents were with their children the entire time they were at NCH, the Court finds that, at most, an "investigation into allegations of child abuse" was initiated by the Emergency Department doctors who reported the injuries to FCCS. Thus, as a matter of law, the right to familial association is not implicated in this case, and Plaintiffs' Section

1983 claim must fail. The Children's Defendants and FCCS's Motions for Summary Judgment (ECF Nos. 155, 156) on Count Seven are **GRANTED**. Inasmuch as the Court has granted summary judgment on the claimed violations of 42 U.S.C. § 1983, Plaintiffs' claim for injunctive relief (Count Nine) is **DENIED as MOOT**.

## V. CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment (ECF Nos.155, 156) are **GRANTED**.

**IT IS SO ORDERED.**

5-19-2017
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**